# EXHIBIT

# A

Eronically FILED by Superior Court of California, County of Los Angeles on 12/22/2021 11:11 AM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Mariano,Deputy Clerk
21STCV46532

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | |
|---|---|
| **NOTICE TO DEFENDANT:**<br>*(AVISO AL DEMANDADO):*<br>KIDS 2, INC. f/k/a KIDSII, INC.<br>3333 Piedmont Road, Suite 1800, Atlanta, GA 30305<br>**YOU ARE BEING SUED BY PLAINTIFF:**<br>*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*<br>TIFFANY WHITE, Individually in her own right, and as Personal Representative of the Estate of<br>CHRISHELL ROBY, Deceased, 12354 Del Sur Street, Victorville, CA 92392 | **FOR COURT USE ONLY**<br>*(SOLO PARA USO DE LA CORTE)* |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Stanley Mosk Courthouse<br>111 N. Hill St.<br>Los Angeles, CA 90012 | **CASE NUMBER:** *(Número del Caso):*<br>21STCV46532 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
The Booth Firm, 14200 Culver Street, Suite 240, Irvine, CA 92603, (267) 231-1195

| | | |
|---|---|---|
| DATE: 12/22/2021<br>*(Fecha)* XDECEMBER XX1, 2021 | Sherri R. Carter Executive Office, by Clerk of Court<br>*(Secretario)* | , Deputy<br>*(Adjunto)*<br>M. Mariano |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☑ on behalf of *(specify):* Kids 2, Inc. f/k/a KIDSII, Inc.
   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)          ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)          ☐ CCP 416.90 (authorized person)
   ☑ other *(specify):* Form Unknown
4. ☐ by personal delivery on *(date):*

[SEAL]

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courts.ca.gov |

21STCV46532

Assigned for all purposes to: Spring Street Courthouse, Judicial Officer: Audra Mori

1  **THE BOOTH FIRM**
2  By:  Quincy Booth, Esquire (SBN 338688)
   quincy@theboothfirm.com
3  14200 Culver Drive
   Suite 240
4  Irvine, CA 92604

5
   **STAMPONE O'BRIEN DILSHEIMER LAW**
6  By:  Kevin P. O'Brien, Esquire
   PA ID No.: 313081 (*CA Pro Hac Vice Motion to Follow Complaint*)
7  kobrien@stamponelaw.com
        Prince P. Holloway, Esquire
8  ID No.: 209591 (*CA Pro Hac Vice Motion to Follow Complaint*)
9  pholloway@stamponelaw.com
   500 Cottman Avenue
10 Cheltenham, PA 19012
   (215)663-0400
11

12 *Attorneys for Plaintiff*

13              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
                       **COUNTY OF LOS ANGELES**
14 --------------------------------------------------------
15 TIFFANY WHITE                          :
   Individually in her own right, and as  :
16 Personal Representative of the Estate of :   Case No.    21STCV46532
   CHRISHELL ROBY, Deceased               :
17 12354 Del Sur Street                   :
   Victorville, CA 92392                  :    **PRODUCT LIABILITY COMPLAINT**
18                                        :    **RELATED TO INFANT DEATH**
                                          :
19       vs.                              :
                                          :    **JURY TRIAL DEMANDED**
20 KIDS 2, INC. f/k/a KIDSII, INC.,       :
21 3333 Piedmont Road, Suite 1800         :
   Atlanta, GA 30305                      :
22 --------------------------------------------------------

23                       **PLAINTIFF'S COMPLAINT**

24
25      1.      Plaintiff, Tiffany White is an adult citizen of the State of California residing therein
26 at 12354 Del Sur Street, Victorville, CA 92392 and is the mother and Personal Representative of
27 the Estate of Chrishell Roby.  A copy of her appointment is attached hereto as Exhibit "A".

28

2.     At all times relevant hereto, Defendant, Kids2, Inc., f/k/a KidsII, Inc., is alleged and therefore averred to be a corporation, partnership, fictitious name and/or other business entity licensed to transact business in the Commonwealth of Pennsylvania, organized under the laws of the State of Georgia with a principal place of business located at 3333 Piedmont Road, Suite 1800, Atlanta, GA 30305.

3.     This Defendant may hereinafter be known as the "Product Defendant" or the "product liability Defendant"

4.     This lawsuit arises out of the tragic and unnecessary death of a 5-month-old infant named Chrishell Roby in a now recalled inclined sleeping product designed, manufactured, and distributed by the Defendant Kids 2.

5.     On June 15, 2016 Tiffany White gave birth to her daughter, Chrishell Roby (The "Plaintiff's Decedent").

6.     As the Plaintiff's Decedent was born premature, she was kept in the Kaiser Health System NICU for several months, and was discharged home in early November of 2016.

7.     On or about October 8th, 2016 Plaintiff Tiffany White purchased a Kids 2 Inclined Sleeper from Burlington Coat Factory in Inglewood California, which was alleged and averred to be a part of the Bright Starts brand which was designed, manufactured, and distributed by Defendant Kids 2.

8.     This Kids 2 Bright Starts Inclined Sleeper will hereinafter be referred to as "the Product".

9.      At all times material hereto, the Bright Starts Inclined Sleeper was manufactured, marketed, sold, advertised, developed and otherwise placed into the stream of commerce by the product liability Defendant.

10.      As is clear by its name, the product was advertised, marketed, and otherwise held out to be a product which was designed for infants to sleep in.

11.      As is now sadly, but abundantly clear, the product, and the class of products known as "infant inclined sleepers" are defective, dangerous, and unsafe for infants as they were designed to place an infant in an unsafe position which interferes with an infant's ability to breathe.

12.      The Defendants knew this prior to November 21, 2016, when the Plaintiff's Decedent died, before June 15, 2016 when the Plaintiff's Decedent was born, as well as for many years before hand.

13.      Despite the product liability Defendant's knowledge of the dangers of allowing children to sleep at an incline, they continued to manufacture, market, sell, advertise, and otherwise place into the stream of commerce the Product, as well as numerous other infant inclined sleeper products all of which were defective, dangerous and unsafe in their design.

**HISTORY OF THE DANGEROUS INFANT INCLINED SLEEPERS**

14.      Inclined sleepers such as the subject product raise a child's head and upper body to an angle of approximately 30 degrees.

15.      In 1992, the American Academy of Pediatrics, which is the largest group of pediatricians recommended in its "Back to Sleep" campaign that children sleep only on their backs.

16.      Those guidelines were updated in 2005 when the AAP issued a policy statement called "The Changing Concept of Sudden Infant Death Syndrome: Diagnostic Coding Shifts, Controversies Regarding the Sleeping Environment and New Variables in Reducing Risk"

17.     This guideline stated that "infants should be placed for sleep in a supine position, wholly on their back for every sleep."

18.     Further, the guidelines stated "use a firm sleep surface: Soft materials or objects should not be placed under a sleeping infant.  A firm crib mattress covered by a sheet is the recommended sleeping surface."

19.     These guidelines were adopted by the National Institute of Health.

20.     The product Defendants knew of these guidelines before developing, designing, manufacturing, or selling the subject product, or any other infant inclined sleeping product.

21.     In 2014, while in the Ingenuity Moonlight Rocking Sleeper, an infant's mother noticed that the sleeper placed the child in a chin-to-chest position while in the product.

22.     The parent noted that "the sleeper lacks any kind of firm support to keep the baby in a safe, semi-reclined position."

23.     This concerned parent expressed her concern that "infants this young can asphyxiate in this position (as has been seen in some baby carriers.)"

24.     This parent stated "I'm concerned that this product presents an asphyxiation hazard and therefore, is not safe for newborns."

25.     The parent submitted a review on the Ingenuity website expressing these concerns, and the company responded with an email stating that they would not publish the review on the website unless the parent removed the safety concern from the review, and suggested that the parent contact their legal team.

26.     This complaint placed the Defendants on notice of the dangers of the very defects which this product posed to infants – the inclined angle, and soft backing can cause asphyxiation

which were the very reasons which the AAP and NIH recommendations on safe sleep had been instituted.

27.     It is alleged and therefore averred that the product liability Defendants were on notice of these dangers in advance of this complaint anyway.

28.     By censoring their products reviews to remove complaints of asphyxiation hazards, the product liability Defendants withheld critical and lifesaving information from consumers.

29.     Withholding this information deprived consumers of the ability to understand the risks which products posed.

30.     This is particularly true as it relates to the subject product given that the warnings on the product, its labels, manuals and brochures were completely misleading and inadequate themselves.

31.     In 2016, the AAP issued again a policy statement titled "SIDS and Other Sleep Related Infant Deaths: Updated 2016 Recommendations for a Safe Infant Sleep Environment".

32.     These guidelines reaffirmed the prior guidelines set forth above.

33.     They recommended as a safe sleep environment "supine position, the use of a firm sleep surface. . . and the avoidance of soft bedding."

34.     These guidelines admonished manufacturers such as the product liability Defendants to "follow safe sleep guidelines in their messaging and advertising."

35.     To "avoid the use of commercial devices that are inconsistent with safe sleep recommendations."

36.     That infants "should be placed for sleep in a supine position (wholly on the back_ for every sleep"

37.     That "elevating the head of the infant's crib is ineffective in reducing gastroesophageal reflux and is not recommended; in addition, elevating the head may result in the infant sliding to the foot of the crib into a position that may comprise respiration."

38.     That the "best evidence suggests that infants should continue to be placed supine until 1year of age. . . Because rolling into soft bedding is an important risk factor for Sudden Unexpected Infant Death after 3 months of age."

39.     That "Infants should be placed on a firm sleep surface (safety approved mattress in a safety approved crib) covered by a fitted sheet with no other bedding or soft objects to reduce the risk of SIDS and suffocation."

40.     That "soft materials should not be placed under a sleeping infant."

41.     That "sitting devices such as car seats, strollers, swings, infant carriers and infant slings are not recommended for routine sleep in the hospital or at home, particularly for young infants."

42.     "If an infant falls asleep in a sitting device, he or she should be removed from the product and moved to a crib or other appropriate **flat** surface as soon as is safe and practical."

43.     That "media and manufacturers should follow safe sleep guidelines in their messaging and advertising. . . Media and advertising messages contrary to safe sleep recommendations may create misinformation about safe sleep practices."

44.     Again, the NIH adopted their support of the AAP recommendations on safe infant sleep, along with the Centers for Disease Control and Prevention, the Maternal and Child Health Bureau of the Health Resources and Services Administration, and the FDA.

45.     The subject product, and each of the products known as infant inclined sleepers violated the most important parts about the AAP guidelines on safe sleep.

46.     The product does not have a firm surface, but rather has a soft backing surrounded by excess and unsafe material.

47.     The product is not flat, but is instead at an incline of approximately 30 degrees.

**Exemplar Product**





48.     The product positions children in a position where their chin falls towards their chest.

49.     The product otherwise creates an asphyxiation/suffocation hazard and increases the risk of harm and/or SIDS.

50.     The product violates the AAP guidelines on safe sleep which have been successful in reducing SIDS and/or SUID by nearly 70% since 1992, and the use of the product significantly increases the risk of harm, including SIDS, SUID, positional asphyxiation, and suffocation as a result of its dangerous and defective design.

51.     The product has violated the AAP safe sleep recommendations which have been in place since 1992 and each iteration and update thereof.

**KIDS 2 CONCEIVES OF AND BEGINS TO SELL THIS DEADLY PRODUCT**

52.     These products were recalled by the Consumer Product Safety Commission on April 26, 2019.   https://www.cpsc.gov/Recalls/2019/kids-ii-recalls-all-rocking-sleepers-due-to-reports-of-deaths

53.     In June of 2021, a Congressional Committee released a report on the dangerous flaws of these products from sale in the United States.   https://oversight.house.gov/news/press-releases/oversight-committee-releases-staff-report-revealing-fisher-price-ignored.

# Infant Deaths in Inclined Sleepers: Fisher-Price's Rock 'n Play Reveals Dangerous Flaws in U.S. Product Safety

**Staff Report**
**Committee on Oversight and Reform**
**U.S. House of Representatives**
**June 2021**
**oversight.house.gov**

54.     On June 2, 2021, the Consumer Product Safety Commission banned the sale of infant inclined sleeping products in the United States.  https://www.cpsc.gov/Newsroom/News-Releases/2021/CPSC-Approves-Major-New-Federal-Safety-Standard-for-Infant-Sleep-Products.

55.     Inclined sleepers violate the safe sleep guidelines of the American Academy of Pediatrics.

56.     The American Academy of Pediatrics ("AAP") has recommended for years that children should sleep on a firm and flat surface.

57.     This guideline was reaffirmed in their 2011 policy statement titled "SIDS and Other Sleep Related Infant Deaths: Expansion of Recommendations for Safe Infant Sleeping Environment."

58.     The AAP has long expressed concerns about these products and the hazards they pose to infants.



American Academy of Pediatrics
DEDICATED TO THE HEALTH OF ALL CHILDREN®

July 5, 2017

U.S. Consumer Product Safety Commission
Office of the Secretary
Room 820
4330 East-West Highway
Bethesda, Maryland 20814

Re: "Safety Standard for Infant Inclined Sleep Products"
Docket No. CPSC-2017-0020

In the Notice of Proposed Rulemaking, the Commission proposes a mandatory safety standard for infant inclined sleep products that is based on the voluntary standard developed by ASTM International (ASTM F3118-17). While we appreciate the effort to impose a safety standard upon this category of products, the AAP has concerns about all inclined sleep products and the hazards they may pose to infants, and we are concerned that a safety standard could give parents and caregivers the mistaken impression that these products have been proven safe.

\*\*\*

**Benjamin Hoffman, MD, FAAP**
American Academy of Pediatrics
Comments before the U.S. Consumer Product Safety Commission
May 1, 2019

The recent recall of the Rock 'n Play Sleeper, which a Consumer Reports article linked to 32 infant deaths[3], underscores what pediatricians have said for years; inclined infant sleepers are dangerous and have no place in a safe sleep environment. Infants should always sleep on their back, on a separate, flat and firm sleep surface without any bumpers or bedding. While we

59.    Kids 2 began to conceive of these products in approximately 2009, in response to the success of Fisher Price "Rock n Play" products, which have now also been recalled in their connection with over 50 infant deaths. https://www.consumerreports.org/child-safety/while-they-were-sleeping/

60.    Almost immediately, Kids 2 was aware of the fact that inclined sleep positions were something of a concern.

61.    Grant Gunnigle, the Chief Operating Officer at the time, and the brother of the CEO Ryan Gunnigle had one of his employees conduct an internet search on sleep positioning in inclined devices.

62.    Based upon this internet search, Grant Gunnigle decided that they would not hire an outside consultant.

63.     However, Kids 2 knew these products were potentially in conflict with the guidelines for safe sleep from the American Academy of Pediatrics – a firm and flat surface is required.

64.     The Kids 2 inclined sleeper is neither firm, nor flat.

65.     In 2011, the AAP released updated guidelines which reaffirmed the "firm flat surface" guidelines.

66.     The product integrity ("PI") engineer at Kids 2 developing the inclined sleeper products was a woman named saw these guidelines, and expressed concern to Mike Steinwachs, a senior design engineer at Fisher Price that the new AAP guidelines could be concerning for their inclined sleeper products because "elevating the head of the infant's crib is not recommended".

67.     The head product integrity engineer at Kids 2 had previously corresponded with Kitty Pilarz, the head of product integrity at Fisher Price, and they attempted to collude to come up with excuses about why these products could somehow still comply with the AAP guidelines.

68.     The PI engineer'sconcerns about the conflict between Kids 2's inclined sleeping products, and the AAP guidelines were never fully addressed at Kids 2.

69.     In developing these products at Kids 2, the company explicitly stated that they were trying to compete with and go after the Fisher Price market share of these products.

70.     Kids 2 did, however, perform market research and in-home consumer testing with mothers in December of 2013 when developing the Ingenuity Brand Moonlight Rocking Sleeper – the exact product in which the Plaintiff's Decedent died from positional asphyxia.

71.     Of the mothers who were surveyed numerous mothers expressed concern about the angle of the product in relation to their child sleeping.

72.     The complaints are terrifying looking back at them.

73.   "The incline was a little steep so he would slide downward and have his chin pressed to his chest.  I would often have to move him repeatedly"

74.   "I did not like how my daughter sunk into it"

75.   "Baby sits up too much for sleeping"

76.   "Sometimes it seems baby is at an awkward angle b/c there isn't a place to lay her flat in this"

77.   "Make the angle less steep, less slipping"

78.   "Flatter bottom for sleeping flatter"

79.   In response to the test group feedback, Kids 2, amazingly acknowledged that there is a "disconnect between wanting the baby to be comfortable in a sleeper/crib, but **safe practices indicate firm, flat surface (doesn't seem comfortable).**

80.   Kids 2 then summarized their findings and indicated that some of the product negatives were that "Mom's wish there was a disclaimer that said "do not use for overnight sleep or prolonged periods of time" and that "the weight of a baby's body on an inclined position may cause them their head to bear down on their shoulder and cause them to slump over."

81.   Despite this, Kids 2 was hell-bent on "going after FP" (Fisher Price) and decided to sell the product anyway.

82.   Almost immediately they had received a complaint from a customer on their website in June of 2014 that the product places a child in a chin-to-chest position, is not firm, and presents an asphyxia risk.

83.   Kids 2 promptly deleted this review of their website – and told the concerned mother to contact their legal team.

84. Kids 2 contended that they deleted the review from their website because they could not identify the product as a Kids 2 product.

85. Kids 2 has speculated that because the mother referred to the product as a hammock, this could not have been their product because their inclined sleeper products were not hammock.

86. Of course, Kids 2 has never removed a glowing review from their website, because it could not be identified as a Kids 2 product.

87. The mother obviously thought the product was a hammock.

88. The product looks exactly like a hammock.

89. Further, the initial design of the Kids 2 inclined sleeper products was called . . . a hammock!

90. Back in 2013, Kids 2 had been told that their inclined sleeper products were not in "line with UK Safe Sleeping guidelines" and that it was "not for sleeping in during the thing, especially not to replace a bed. . . baby should not be left alone in this product as it does not have the safety features of a cot or a crib."

91. Additionally, in 2015, a Kids 2 employee named wrote to the head of Product Integrity and notified him of an article written by a pediatrician named Roy Benoroch, who was actually her own child's pediatrician, which "called out" the Fisher Price Bright Starts Inclined as unsafe for infant sleep – because "if their heads fall forward. . . **they can die**.

As I've written about before, the American Academy of Pediatrics has established specific guidelines on the safest ways for healthy babies to sleep. I last reviewed them in detail here. In summary, babies should always be put down on their backs to sleep on a firm, flat surface, like a crib or bassinet. Baby sleep positioners that hold an infant in place are a bad idea. Things that hold babies in an upright or semiupright position, like the Fisher-Price Rock 'n Play Sleeper, are also a bad idea. Why?

They're dangerous because little babies have big, heavy heads, and they lack the strength and muscle control to protect their little baby airways. If their heads fall forward, or their necks get entangled in a strap, they can die.

https://pediatricinsider.wordpress.com/2015/05/28/swings-slings-and-car-seats-are-not-for-sleeping/

92.     Of course, Kids 2 sold this *exact same* product.

93.     The head of product integrity responded, in 2015, that this was a "great article" . . . but obviously continued to sell the product.

94.     It is outright impossible for Kids 2 to have reviewed this article and not have known that these products can kill infants.

95.     Despite their personal knowledge of these numerous deaths, and countless concerned mothers and medical professionals expressing their concern to the CPSC – which was provided to Kids 2 – Kids 2 (and the other product manufacturers for that matter) continued to sell this dangerous product.

### CHRISHELL ROBY DIES AS A RESULT OF THIS DANGEROUS PRODUCT

96.     The Plaintiff's Decedent was born on June 15, 2016 at 24 weeks.

97.     After spending nearly 5 months in the hospital, she was discharged home on November 17, 2016 weighing 10 lb, 6oz.

98.     Plaintiff's Decedent had no problems breathing.

99.     On November 21, 2016 Tiffany White put the Plaintiff's Decedent down in the Bright Starts Sleeper and went to sleep.

100.    Waking at about 2:00 am, White left the room to go prepare breast milk for Chrishell.

101.    After preparing the bottle several minutes later, Plaintiff Tiffany White returned to the room to find the Plaintiff's Decedent in the sleeper, with her chin on her chest, unresponsive and not breathing.

102.    Plaintiff Tiffany White immediately called 911 and began performing CPR.

103.    Chrishell Roby was taken to Victor Valley Global Medical Center with a diagnosis of cardiorespiratory arrest where she was pronounced dead.

104.    Initially, the physicians would not provide White a cause of death, however, after significant pestering, a death certificate was signed on December 27, 2016 by James M. Sutcliffe, M.D., which indicated the cause of death as "pending".

105.    That certificate was not certified until January 12, 2017, after which it was provided to the Plaintiff.

106.    This death certificate provided no answers to the Plaintiff Tiffany White about the cause of her daughter's death.

107.    An autopsy was performed, which was completed on December 21, 2016 by Brian Hutchins, M.D., which again indicated the cause of death as being "undetermined".

108.    This autopsy report was not signed until July 14, 2017 and did not provide a cause of death.

109.    For years, Plaintiff Tiffany White had no idea what caused her daughter to die.

110.    Plaintiff Tiffany White believed that the Bright Starts Inclined Sleeper was a safe product for her daughter to sleep in and posed no risk of injury or death to Plaintiff's Decedent.

111.    No one – no medical doctor, law enforcement official, police officer, sheriff, coroner, nurse, or any other person under the sun ever told Plaintiff Tiffany White that an inclined sleeper could have had anything to do with her daughter's death.

112.    On June 21, 2021 Plaintiff Tiffany White received a telephone call from her ex, the father of Plaintiff's Decedent, informing her that he had seen on the news a report that inclined sleeping products had been the subject of a congressional hearing – and that they had been banned by the United States Government (The CPSC) for sale in the United States.

113.    This event was widely reported in the news, and occurred contemporaneously with the release of the Congressional Report set forth above in paragraphs 53-54.

114.    Prior to that date, Plaintiff was without knowledge that her daughter's death was related in any way to the Product in which she was sleeping.

115.    To the contrary – Defendant actively marketed and represented to customers, including the Plaintiff's Decedent that the Product was safe for infant sleep.

116.    Indeed, to this day, despite the product being banned for sale, the Defendant still asserts that their product is safe for infant sleep despite insurmountable medical evidence and testimony to the contrary.

117.    The Defendant went to great lengths to conceal negative information about their products from consumers such as the Plaintiff including deleting customer reviews which specifically refer to the risks of positional asphyxia from their website product reviews, ensuring that prospective customers (and victims) such as White would never know of the risks which their inclined sleeping products presented for positional asphyxia.

118.    Further, Defendant concealed the known risks of positional asphyxia, and the chin-to-chest position which causes positional asphyxia from their product literature, manuals, and warnings.

119.    Despite all of the evidence set forth above (of which significantly more exists) which establishes that Defendant had been told that their product places children in the chin-to-chest position including in their testing groups, and more, the Defendant refused to place any notification on their warning label that their product can cause asphyxia in the chin-to-chest position.

120.    This is an example of the warning from an identical product manufactured by the Defendant.  As is clear – it says nothing about positional asphyxia, or the chin-to-chest position.



121.    This warning is mis-leading in several material ways.

122.   At first, it states that infants have suffocated on "added pillows, blankets, and extra padding" which leads consumers to reasonably conclude that the padding that comes with the Product is safe and cannot cause suffocation – which is untrue and contradicted by the AAP guidelines which clearly states that any soft material can cause suffocation.

123.   Defendants also omit the critical fact of which they were well aware – that infants can and have died from positional asphyxia, particularly in the chin-to-chest position.

124.   This can occur when an infant's head falls forward with their chin pointed down or to the side and is unable to move their head out of that position and their airway becomes occluded preventing oxygen from passing through.

125.   Kids 2 was aware of the relationship between the chin-to-chest position and positional aspxhyxia since they received complaints about the risk from consumers in 2014, and long before that for that matter.

126.   Despite this knowledge, Kids 2 actively worked to keep any warnings about positional asphyxia off their product in order to mislead consumers and victims so they were not aware of the relationship between their infant's injuries and deaths and to increase their sales and profits at the expense of infant safety.

127.   In fact, Kids 2 had a warning on *other* products not designed for sleep which informed consumers of the risks of positional asphyxia, if even in a self-serving and misleading way.

> **SUFFOCATION HAZARD:** Young infants have limited head and neck control. If the seat is too upright, infant's head can drop forward and compress the airway.
> - **ALWAYS** keep swing seat fully reclined until infant is at least 4 months old AND can hold up head without help.
>
> **SUFFOCATION HAZARD:** Babies have suffocated when seats tipped over on soft surfaces.
> - **NEVER** use on a bed, sofa, cushion, or other soft surface.

128.   Finally, the warnings on the Product is misleading in that it states that a child should "always be placed on their back to sleep" but fails to state what the AAP has recommended for years – that an infant should always place infants in the supine position – flat on their backs on a firm surface to sleep.

129.   The statute of limitations should be tolled based upon Defendants continuous actions of designing, selling, manufacturing, marketing and/or distributing these products which they knew were dangerous and deadly – but which they marketed a safe and comfortable.

130.   Defendant had actual knowledge of these dangers but continued to sell these products – and blame parents and caregivers in the case of a death or injury evidencing their continuing wrong sufficient to render inapplicable any statute of limitations that the Defendants may seek to apply.

131.   The statute of limitations should also be tolled as Defendant fraudulently concealed the true quality and nature of their inclined sleepers, and made material misrepresentations that these products were safe for overnight use.

132.   Defendant knew that these products were not safe for overnight sleep since the moment they conceived of them.  They knew of the 2011 AAP guidelines – that infants should sleep on a firm and flat surface – but designed a soft and inclined surface anyway.

133.   Defendant's head of product integrity, Bob Coughlin was told outright by an employee that her own Pediatrician said that inclined sleepers can cause infant's head's to fall forward and they can die – but Kids 2 did nothing.

134.   Despite this knowledge of their defective and dangerous design, Defendant concealed this information and these complaints from consumers, and continued to sell the products to them.

135.   Defendant's purpose in hiding this information from consumers was to prevent them from seeking redress in the Court system.

136.   Plaintiff relied upon the Defendant to disclose to her the risks of the products which she was purchasing for her precious daughter – because the Plaintiff had no way of discovering that information through her own efforts.

137.   Any applicable statute of limitations has been tolled by the Defendant's knowledge, active concealment, and denial of the facts alleged, and the Defendant continues to do so today, flagrantly asserting that their products are safe for infant sleep.

138.   The Plaintiff's Decedent died as a result of the negligence, carelessness, wanton, and reckless conduct of the Defendants and the sale and distribution of their defective and dangerous product which was not safe for its intended and foreseeable use as an infant sleeping product.

139.   As a further result of the aforesaid, Plaintiff's Decedent was obliged to receive and undergo medical attention and care, including rehabilitation, hospitalization, surgical procedures, which caused his parents and Estate to incur various and diverse medical expenses.

140.   As a further direct and proximate result of the negligence, carelessness, wanton, and reckless conduct of the Defendants, Plaintiff's Decedent suffered great physical pain and suffering, trauma, mental anguish, embarrassment and humiliation.

141.   As a further direct and proximate result of the negligence, carelessness, wanton, and reckless conduct of the Defendant, Plaintiff's Decedent's daily activities, occupation and usual life's pleasures were forever extinguished.

142.    As a further direct and proximate result of the negligence, carelessness, wanton, and reckless conduct of the Defendants, Plaintiff's Decedent's earnings, earning capacity and employment opportunities were terminated.

143.    As a further direct and proximate result of the negligence, gross negligence, recklessness and/or carelessness of the Defendants, the Estate of Chrishell Roby incurred liability for emergency medical services, funeral and household expenses.

**FIRST CAUSE OF ACTION**
**STRICT LIABILITY – NEGLIGENT DESIGN**
**PLAINTIFF V. KIDS 2, INC.**

144.    Plaintiffs repeat and reallege the allegations contained in the preceding and subsequent paragraphs, as if fully set forth herein.

145.    At all pertinent times, Defendant were manufacturing, marketing, testing, promoting, selling and/or distributing the Bright Starts Inclined Sleeper in the regular course of business.

146.    Defendant caused the Bright Starts Inclined Sleeper to enter the stream of commerce and to be sold through various retailers and registries where Plaintiffs obtained the product.

147.    The Bright Starts Inclined Sleeper was expected to and in fact did reach consumers, including Plaintiff and Plaintiff's Decedent, without change from its original manufactured condition.

148.    The Bright Starts Inclined Sleeper was sold by Defendant or otherwise released into the stream of commerce.

149.    Plaintiffs used the Bright Starts Inclined Sleeper in a manner normally intended, recommended, promoted and marked by Defendants.

150.     The Bright Starts Inclined Sleeper failed to perform safely when used by Plaintiffs in a reasonably foreseeable manner, specifically as a sleeper.

151.     Even when used in a manner intended, the Bright Starts Inclined Sleeper was unreasonably dangerous because use carried with it the significant increased risk of positional asphyxiation, choking, aspiration, suffocation, and SIDS.

152.     Defendant knew, or should have known, that the Bright Starts Inclined Sleeper was unreasonably dangerous when used as an infant sleeper and yet Defendant continued to design, manufacture, sell, distribute, market, promote and supply the Bright Starts Inclined Sleeper so as to maximize sales and profits at the expense of the infant health and safety in conscious disregard of the foreseeable harm to the consuming public, namely infants, including the now deceased infant children of Plaintiffs.

153.     As a direct and proximate cause of Defendant's conduct, including actions, omissions and misrepresentations, Plaintiff sustained both economic and non-economic damages including but not limited to physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment, and impairment of quality of life.

**SECOND CAUSE OF ACTION**
**STRICT LIABILTY – FAILURE TO WARN**
**PLAINTIFF V. KIDS 2**

154.     Plaintiffs repeat and reallege the allegations contained in the preceding and subsequent paragraphs, as if fully set forth herein.

155.     At all pertinent times, Defendant was manufacturing, marketing, testing, promoting, selling, and/or distributing the Bright Starts Inclined Sleeper in the regular course of business.

156.     At all pertinent times, the Plaintiff used the Bright Starts Inclined Sleeper as a sleeper for their infant children, which was a reasonably foreseeable use.

157.    The Plaintiff was justified in their reliance upon Defendant's Bright Starts Inclined Sleeper warnings, instructions, and/or express factual representations.

158.    At all pertinent times, Defendant knew or should have known that the use of the Bright Starts Inclined Sleeper for any type of sleeping carried with it the significant increased risk of positional asphyxiation, choking, aspiration, suffocation and SIDS.

159.    At all pertinent times, the Bright Starts Inclined Sleeper, when put to the aforementioned foreseeable use by the Plaintiff, was an unreasonably dangerous and defective product because it failed to contain adequate, proper warnings and/or instructions regarding the increased risk of positional asphyxiation, choking, aspiration, suffocation and SIDS.

160.    Defendant thus failed to property and adequately warn and instruct the Plaintiff and Plaintiff's Decedent as to the risks and benefits of the Bright Starts Inclined Sleeper.

161.    Had the Plaintiff been given the warning that the use of the Bright Starts Inclined Sleeper would significantly increase the risk of positional asphyxiation, choking, aspiration, suffocation, and SIDS in relation to their infant children, she would not have used it.

162.    As a direct and proximate result of the Defendant's design, manufacturing, marketing, sale and distribution of the Bright Starts Inclined Sleeper, Chrishell Roby lost her life.

163.    The death of Chrishell Roby was the direct and proximate result of the unreasonably dangerous and defective condition of the Bright Starts Inclined Sleeper at the time of sale, including its lack of adequate warnings.

164.    Defendant knew, or should have known, that the Bright Starts Inclined Sleeper was unreasonably dangerous because it lacked proper warnings and yet Defendant continued to design, manufacture, sell, distribute, market, promote, and supply the Bright Starts Inclined Sleeper so as to maximize sales and profits at the expense of newborn health and safety in conscious disregard

of the foreseeable harm to the consuming public, namely infants including the now deceased Chrishell Roby.

165.    As a direct and proximate result of Defendant's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained both economic and non-economic damages including but not limited to physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life.

### THIRD CAUSE OF ACTION
### NEGLIGENCE
### PLAINTIFF V. KIDS 2, INC.

166.    Plaintiff repeats and reallege the allegations contained in the preceding and subsequent paragraphs, as if fully set forth herein.

167.    Defendant was negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, advertising, selling and/or distributing the Bright Starts Inclined Sleeper in one or more following respects:

    a.  Failing to warn Plaintiff and the general public of the hazards associated with the use of the Bright Starts Inclined Sleeper;

    b.  Failing to properly test the Bright Starts Inclined Sleeper to determine adequacy and effectiveness for safety measures, if any, prior to releasing the Bright Starts Inclined Sleeper for consumer use;

    c.  Failing to properly test the Bright Starts Inclined Sleeper to determine the risk of positional asphyxiation, choking, aspiration, suffocation and SIDS during its normal/intended use;

    d.  Failing to inform the ultimate users, including the Plaintiff parents, as to the safe and proper methods of using the Bright Starts Inclined Sleeper;

    e.  Failing to remove the Bright Starts Inclined Sleeper from the market when Defendants knew or should have known that it was defective;

     f.  Failing to instruct the ultimate users, including the Plaintiff parents, as to the methods for reducing the increased risk of choking, aspiration, suffocation and SIDS;

     g.  Failing to inform the public and the Plaintiff parents of the known dangers of using the Bright Starts Inclined Sleeper during its intended use;

     h.  Marketing and labeling the products as safe for all uses despite knowledge to the contrary; and

     i.  Failing to act like a reasonably prudent company under similar circumstances.

168.    Each and all of these acts and omissions, taken alone or in combination, were a proximate cause of the injuries and damages sustained by Plaintiff.

169.    At all pertinent times, Defendant knew or should have known that the Bright Starts Inclined Sleeper was unreasonably dangerous and defective when put to its reasonably intended use.

170.    As a direct and proximate result of Defendant's conduct, including actions, omissions and misrepresentations, Plaintiff sustained both economic and non-economic damages including but not limited to physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life.

**FOURTH CAUSE OF ACTION**
**BREACH OF WARRANTY**
**PLAINTIFF V. KIDS 2, INC.**

171.    Plaintiff incorporates by reference the preceding paragraphs as if the same were set forth fully herein.

172.    Defendants expressly and impliedly warranted that the product was safe and fit for the particular purpose for which it was made.

173.    Defendant's breach of contract/warranty consisted, *inter alia*, of selling a defective and dangerous product.

174.    Plaintiff's Decedent, in purchasing and using the product, relied on the skill, judgment, representations and foregoing implied and express warranties of the Defendants. Said warranties and representations were false in that the aforementioned product was not safe; was un-merchantable; and, was unfit for the ordinary purpose and uses for which it was intended and caused Plaintiff's injuries.

175.    Prior to the time the product was used by the Plaintiff's Decedent and his family members and caretakers, the Defendants had implied warranties to the general public that the said product was of merchantable quality and safe and fit for the use for which it was intended.

176.    The general public is reasonably relied on the skill, judgment and implied warranty of the Defendants in using the aforementioned product.

177.    The product was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that it had dangerous propensities when put to its intended use and would cause severe injuries to the user and/or persons in close proximity.

178.    The aforementioned breach of warranty was the proximate cause of the injuries and damages sustained by the Plaintiff as set forth above.

179.    As a direct and proximate result of Defendant's conduct, including actions, omissions and misrepresentations, Plaintiff sustained both economic and non-economic damages including but not limited to physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life.

**FIFTH CAUSE OF ACTION**
**GROSS NEGLIGENCE**
**PLAINTIFF V. KIDS 2, INC.**

180.    Plaintiffs repeat and reallege the allegations contained in the preceding and subsequent paragraphs, as if fully set forth herein.

181.   Defendant lacked care and departed in an extreme manner from what a reasonably careful and similarly situated company would do with respect to marketing, designing, manufacturing, producing, supplying, inspecting, testing, advertising, selling and/or distributing the Bright Starts Inclined Sleeper in one or more following respects:

    a.   Failing to warn Plaintiffs and the general public of the hazards associated with the use of the Bright Starts Inclined Sleeper;

    b.   Failing to properly test the Bright Starts Inclined Sleeper to determine adequacy and effectiveness of safety measures, if any, prior to releasing the Bright Starts Inclined Sleeper for consumer use;

    c.   Failing to properly test the Bright Starts Inclined Sleeper to determine the risk of positional asphyxiation, choking, aspiration, suffocation and SIDS during its normal/intended use;

    d.   Failing to inform the ultimate users, including the Plaintiff parents, as to the safe and proper methods of using the Bright Starts Inclined Sleeper;

    e.   Failing to remove the Bright Starts Inclined Sleeper from the market when Defendants knew or should have known that it was defective;

    f.   Failing to instruct the ultimate users, including the Plaintiff parents, as to the methods for reducing the increased risk of choking, aspiration, suffocation and SIDS;

    g.   Failing to inform the public and the Plaintiff parents of the known dangers of using the Bright Starts Inclined Sleeper during its intended use;

    h.   Marketing and labeling the products as safe for all uses despite knowledge to the contrary; and

    i.   Failing to act like a reasonably prudent company under similar circumstances.

182.   Each and all of these grossly negligent acts and omissions, taken alone or in combination, were a proximate cause of the injuries and damages sustained by Plaintiffs.

183.   At all pertinent times, Defendant knew or should have known that the Bright Starts Inclined Sleeper was unreasonably dangerous and defective when put to its reasonably intended use.

184.    Accordingly, Defendant recklessly disregarded the consequences of their actions or other people, including babies they put at risk of injury and death by using their product as described.

185.    As a direct and proximate result of Defendant's conduct, including actions, omissions and misrepresentations, Plaintiff sustained both economic and non-economic damages including but not limited to physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life.

## SIXTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT
## PLAINTIFF V. KIDS 2, INC.

186.    Plaintiffs repeat and reallege the allegations contained in preceding and subsequent paragraphs, as if fully set forth herein.

187.    Defendant owed consumers, including the Plaintiff parents, a duty to fully and accurately disclose material facts regarding the Bright Starts Inclined Sleeper, not to conceal material defects related to the Bright Starts Inclined Sleeper, not to place this defective product into the stream of commerce, and to fully and accurately label their packaging.

188.    Instead, Defendant explicitly and implicitly represented that the Bright Starts Inclined Sleeper was safe and effective for its intended use.

189.    Defendant actively and intentionally concealed and/or suppressed material facts in whole or in part, to induce consumers like the Plaintiff parents to purchase, register for, receive, and/or use the Bright Starts Inclined Sleeper.  Specifically;

       a.    Defendant had been aware of the safe sleeping standards that require infants to be placed in a supine position while sleeping;

     b.  Defendant have been aware that there was no medical or scientific study or research conclusively indicating that an increased angle of recline somehow lessened the risk of gastrointestinal reflux or other related issues;

     c.  Defendant have been aware of consumer reports involving infant injury or death related to other incline sleeping devices; and

     d.  Defendant had been aware of both public and non-public customer complaints related to infant injury and/or death involving the Bright Starts Inclined Sleeper.

190.    Defendant made the misrepresentations and/or omissions for the purpose of deceiving and defrauding the Plaintiff parents with the intention of having them act and rely on such misrepresentations and/or omissions.

191.    Defendant knew that their concealments, misrepresentations, and/or omissions were material, and that they were false, incomplete, misleading, deceptive, and deceitful when they were made.  Alternatively, Defendant concealed information, and/or made the representations with such reckless disregard for the truth that knowledge of the falsity can be imputed to them.

192.    Defendant profited significantly from their unethical and illegal conduct, conduct which directly resulted in the untimely death of Chrishell Roby.

193.    Defendant's actions, and the Plaintiff parents' justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damages.

194.    As a direct and proximate result of the Defendant's conduct, including actions, omissions and misrepresentations, Plaintiff sustained both economic and non-economic damages including but not limited to physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment, and impairment of quality of life.

///

## SEVENTH CAUSE OF ACTION
## FRAUD/ INTENTIONAL MISREPRESENTATION
## PLAINTIFF V. KIDS 2, INC.

195.     Plaintiffs repeat and reallege the allegations contained in preceding and subsequent paragraphs, as if fully set forth herein.

196.     Defendant, when engaged in the design, development, manufacture, marketing, sale and distribution of the Bright Starts Inclined Sleeper owed a duty to provide accurate and complete information regarding the product.

197.     Defendant fraudulently misrepresented the Bright Starts Inclined Sleeper as safe and effective to the consuming public, including the Plaintiff parents that:

a.   The "Baby can sleep at a comfortable incline all night long!";

b.   It was a "nighttime sleeper";

c.   That there was a "comfortable incline for babies who need it"; and

d.   That the Bright Starts Inclined Sleeper was safe for infants under 3 months old.

198.     Defendant knew that these misrepresentations and/or omissions were material and that they were false, incomplete, misleading, deceptive and deceitful when they were made.

199.     Defendant made the misrepresentations and/or omissions for the purpose of deceiving and defrauding consumers, including the Plaintiff parents, with the intention of having the act and rely on such misrepresentations and/or omissions.

200.     The Plaintiff parents relied, with reasonable justification, on the misrepresentations by Defendant, which induced them to register for, purchase, receive and/or use the Bright Starts Inclined Sleeper for Chrishell Roby.

201.     As a direct and proximate result of Defendant's conduct, including actions, omissions and misrepresentations, Plaintiff sustained both economic and non-economic damages

including but not limited to physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment, and impairment of quality of life.

## EIGTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
## PLAINTIFF V. KIDS 2, INC.

202.    Plaintiffs repeat and reallege the allegations contained in preceding and subsequent paragraphs, as if fully set forth herein.

203.    Defendants had a duty to accurately and truthfully represent to the community Plaintiffs and public, that the Bright Starts Inclined had been tested and found to be safe for use as an infant sleeper.  The representations made by Defendant, written and oral, in fact, were false.

204.    Defendant failed to exercise ordinary care in the representations concerning the Bright Starts Inclined Sleeper while they were involved in its manufacture, sale, testing, quality assurance, quality control, and distributions in interstate commerce, because Defendant misrepresented the Bright Starts Inclined Sleeper's increased risk of positional asphyxiation, choking, aspiration, suffocation and SIDS.

205.    Defendant breached their duty in representing that the Bright Starts Inclined Sleeper was safe for prolonged overnight sleep and had no serious increased risk of infant injury or death.

206.    As a foreseeable, direct, and proximate result of the negligent misrepresentations concerning the Bright Starts Inclined Sleeper, Defendant knew and had reason to know that the Bright Starts Inclined Sleeper had not been sufficiently tested or studied at all for positional asphyxiation or suffocation, and that they lacked adequate and accurate warnings, and that it created a high risk, higher than acceptable risk, and/or higher than reported and represented risk of infant injury or death.

207.   As a direct and proximate result of Defendant's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained both economic and non-economic damages including but not limited to physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment, and impairment of quality of life.

### NINTH CAUSE OF ACTION
### VIOLATION OF THE UCL
### PLAINTIFF V. KIDS 2, INC.

208.   Plaintiffs repeat and reallege the allegations contained in preceding and subsequent paragraphs, as if fully set forth herein.

209.   Defendant is a supplier, manufacturer, advertiser, and seller of the Bright Starts Inclined Sleepers and are subject to liability under Cal. Bus. & Prod. Code § 17200 for unfair, deceptive, fraudulent, and unconscionable consumer sales practices.

210.   Pursuant to California UCL, Defendant has a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacturing, promotion and sale of the Bright Starts Inclined Sleepers.

211.   In violation of Cal. Bus. & Prof Code § 17200, Defendant engaged in fraudulent methods of competition and deceptive acts or practices including the following:

   a.   Stating in marketing and promotional materials that Bright Starts Inclined Sleeper was safe for infant sleep when in fact it was not;

   b.   Engaging in fraudulent conduct that created the likelihood of confusion or misunderstanding; and

   c.   Concealing information regarding infant injuries and deaths involving the Bright Starts Inclined Sleeper.

///

212.    Defendant intended for the public, including the Plaintiff parents to rely on their representation and advertisements regarding the Bright Starts Inclined Sleepers in order to achieve monetary gain from Plaintiff and the consuming public via purchase of their products.

213.    The Plaintiff parents registered for an used the Bright Starts Inclined Sleeper for their now deceased infant child and thereby have suffered an ascertainable loss as a result of Defendant's violations of the UCL.

214.    Had Defendant not engaged in the deceptive conduct described herein, the Plaintiff parents would not have purchased, registered for, received, and/or used Defendant's Bright Starts Inclined Sleeper, and would not have incurred related injuries and damages.

215.    Defendant engaged in wrongful conduct while at the same time obtaining, under false pretenses, monetary gain from the Plaintiff parents and the consuming public for Bright Starts Inclined Sleepers that would not have been utilized had Defendant conducted themselves without fraud.

216.    Plaintiffs were injured by the cumulative and indivisible nature of Defendant's conduct, the effect of which was directed at the Plaintiff parents and the consuming public to create a demand for and sell more Bright Starts Inclined Sleepers.  Each aspect of Defendant's conduct combined to create sales of the Bright Starts Inclined Sleepers.

217.    Defendant had actual knowledge of the defective and dangerous condition of the Bright Starts Inclined Sleeper and failed to take any action to cure it.

218.    The Plaintiff parents reasonably relied upon Defendant's misrepresentations and omissions in determining which product to purchase, register for, receive, and/or use.

219.    As a direct and proximate result of Defendant's conduct, including actions, omissions, and misrepresentations, Plaintiff sustained both economic and non-economic damages

including but not limited to physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment, and impairment of quality of life.

## TENTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## PLAINTIFF V. KIDS 2, INC.

220.    Plaintiffs repeat and reallege the allegations contained in preceding and subsequent paragraphs, as if fully set forth herein.

221.    From the moment Defendant released their product into commerce, it was entirely foreseeable that the Inclined Sleepers would cause infants to die.

222.    Shortly after Defendant released their product into commerce, they had already been both directly and constructively informed of adverse events, complaints, concerns of the chin-to-chest position, concerns of positional asphyxia, and other safety related complaint with the use of their Inclined Sleepers and with the use of other inclined sleepers.

223.    Defendant had also been well aware of AAP and similar guidelines concerning infant sleeping and the risk associated with an inclined sleeping position.

224.    It was also entirely foreseeable that anyone who found their infant relative suffocated due to a Bright Starts Inclined Sleeper would endure serious emotional distress.

225.    Due to Defendant's conduct, the Plaintiff had to witness their infant child laying unresponsive in the Bright Starts Inclined Sleeper.

226.    Due to Defendant's conduct, the Plaintiff had to witness paramedics work furiously to attempt bringing their infant child/sibling back to life.

227.    Due to Defendant's conduct, the Plaintiff had to personally endure the horrible news that their infant child was dead.

228.    Due to Defendant's conduct, the Plaintiff had to personally endure the additional emotional distress that comes with learning of the loss of a beloved relative, especially one as young as Chrishell Roby.

229.    Defendant's failure to recall the Bright Starts Inclined Sleeper prior to the death of Chrishell Roby was a substantial, direct, and proximate cause of the severe emotional trauma, suffering, horror, grief, and shock the Plaintiff had to endure, the likes with which no reasonable person could cope.

230.    Defendant's failure to recall the Bright Starts Inclined Sleeper prior to the death of Chrishell Roby was a substantial, direct, and proximate cause of the severe emotional trauma, suffering, horror, grief, and shock that the deceased infant's siblings had to endure, the likes with which no reasonable child could cope.

231.    As a direct and proximate result of Defendant's conduct, including actions, omissions and misrepresentations, Plaintiff sustained both economic and non-economic damages including but not limited to physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life.

### ELEVENTH CAUSE OF ACTION
### WRONGFUL DEATH
### PLAINTIFF V. KIDS 2, INC.

232.    Plaintiff repeats and realleges the allegations contained in the preceding and subsequent paragraphs, as if full set forth herein.

233.    The death of Chrishell Roby occurred in California.

234.    Defendants' conduct was a substantial, direct and proximate cause of this infant death.

235.   Plaintiff claims all damages under the California (or applicable states law) Wrongful Death Act.

236.   As a direct and proximate result of Defendant's conduct, including actions, omissions, and misrepresentations, the beneficiaries and/or survivors of Plaintiff's Decedent sustained both economic and non-economic damages including but not limited to the loss of her counsel, services, companionship and society, support, relationship, a loss of financial support, and the beneficiaries have been wrongfully deprived of the contributions they would have received from him, including monies which she would have provided for items such as clothing, food, shelter, medical care, education and entertainment, recreation and gifts incur and said beneficiaries have been caused to pay various expenses for medical treatment, hospital care, custodial care, nursing care and medications, and funeral and other expenses related to her death.

237.   The wrongful death beneficiaries under the law are:

a.   Tiffany White
     12354 Del Sur Street
     Victorville, CA 92392

b.   Christopher Roby
     Chuckawalla Valley State Prison
     19025 Wiley's Well Road
     Blythe, CA 92225

## TWELVTH CAUSE OF ACTION
## SURVIVAL ACTION
## PLAINTIFF V. KIDS 2, INC.

226.   Plaintiff repeats and realleges the allegations contained in the preceding and subsequent paragraphs, as if full set forth herein.

227.   Defendants' conduct was a substantial, direct and proximate cause of this infant death.

228.     Plaintiff claims all damages under the California (or applicable states law) Survival Act.

229.     As a direct and proximate result of Defendant's conduct, including actions, omissions, and misrepresentations, Plaintiff's Decedent's Estate sustained both economic and non-economic damages including but not limited the severe injuries to Chrishell Roby which resulted in her death; the anxiety, horror, fear of impending death, mental disturbance, pain, suffering and other intangible losses which Chrishell Roby suffered prior to her death; the loss of past, present and future earning capacity suffered by Chrishell Roby from the date of her death until the time in the future she would have lived had she not died as a result of the injuries she sustained; expenses for medical care; the loss and total imitation and deprivation of her normal activities, enjoyment of life, pursuits and life's pleasures from the date of her death until such time in the future as she would have lived had she not died as a result of the injuries sustained.

## BASIS FOR PUNITIVE DAMAGES

230.     Plaintiffs repeat and reallege the allegations containing in the preceding and subsequent paragraphs, as if fully set forth at length.

231.     Defendant committed malice, oppression, and fraud in one or more of the following ways:

a.  Defendant knew of the dangers of the chin-to-chest position, the increased risk of positional asphyxiation, choking, aspiration, suffocation and SIDS before manufacturing, marketing, distributing, and/or selling the Bright Starts Inclined Sleeper, yet purposefully proceeded with such actions;

b.  Despite their knowledge of the increased risks associated with the Bright Starts Inclined Sleeper, Defendant knowingly concealed the known risk to the consuming

public including Plaintiffs, through marketing, promotion efforts, product labeling, and manipulation of the regulatory framework which regulated the use of their defective product;

c.  Through the actions outline above, Defendant expressed a reckless indifference to the safety of the Bright Starts Inclined Sleeper users and their families, including Plaintiffs.  Defendant's conduct, as described herein, knowing the dangers and risks of the Bright Starts Inclined Sleepers, yet concealing and/or omitting this information, in furtherance of their conspiracy and concerted action was outrageous because of Defendant's evil motive or reckless indifference to the safety of users of the Bright Starts Inclined Sleeper.

232.    In short, Defendant knew the Bright Starts Inclined Sleeper could (and likely would) cause infant deaths if used as a sleeper, and Defendants marketed the product as a sleeper anyway.  Defendant's willful, knowing and cruel disregard for the rights and safety of babies was despicable, and it resulted in the death of Chrishell Roby.

233.    The Defendant's conduct constituting malice, oppression, and fraud was committed by, authorized by, and adopted by one or more employees, officers, directors and agents within the corporate hierarchy of Defendant, who acted on behalf of Defendant.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs each respectfully request relief against Defendant on each of the above-referenced claims and causes of action as set forth below:

234.    Awarding compensatory damages in excess of $25,000.00, including but not limited to both economic and non-economic damages including wrongful death, physical and

mental pain and suffering, emotional distress, fear of death, inconvenience, loss of enjoyment, and impairment of quality of life, and other damages as may be determined at trial of this action;

235.    Awarding economic damages in the form of medical expenses, burial and funeral expenses, funeral transportation costs, out of pocket expenses, and other economic damages in an amount to be determined at trial;

236.    Punitive and/or exemplary damages, to the extent permitted under California and/or other applicable law, for the wanton, willful, fraudulent, reckless acts of the Defendant who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and Plaintiffs in an amount sufficient to punish Defendant and deter future similar conduct;

237.    Pre-judgment interest;

238.    Post-judgment interest;

239.    Awarding Plaintiff reasonable attorneys' fees;

240.    Awarding Plaintiff the costs of these proceedings; and

241.    Such other and further relief as this Court deems just and proper.


Respectfully submitted,

**THE BOOTH FIRM**

BY:_____/s/_____
               QUINCY BOOTH, ESQUIRE
               (SBN 338688)
               quincy@theboothfirm.com
               14200 Culver Drive
               Suite 240
               Irvine, CA 92604

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**STAMPONE O'BRIEN DILSHEIMER LAW**

BY:_____/s/_____

       KEVIN P. O'BRIEN, ESQUIRE
       PRINCE P. HOLLOWAY, ESQUIRE
       kobrien@stamponelaw.com
       pholloway@stamponelaw.com
       500 Cottman Avenue
       Cheltenham, PA 19012
       (215)663-0400

       *Attorneys for Plaintiff*
       *Pro Hac Vice Motions Forthcoming*

21STCV46532

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Quincy E. Booth, Esquire (SBN: 338688)<br>The Booth Firm<br><br>TELEPHONE NO.: (267) 231-1195    FAX NO. (Optional): (215) 501-5124<br>E-MAIL ADDRESS: quincy@theboothfirm.com<br>ATTORNEY FOR (Name): Tiffany White and the Estate of Chrishell Roby | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  LOS ANGELES
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS: 111 N. Hill Street
CITY AND ZIP CODE: Los Angele, 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:
Tiffany White, Individually and as Personal Representative of the Estate of Chrishell Roby v. Kids 2

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER: |
|---|---|---|---|
| [x] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | 21STCV46532 |
| | | | JUDGE: |
| | | | DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [x] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition (not specified above) (43)

2. This case [ ] is  [x] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [x] monetary  b. [ ] nonmonetary; declaratory or injunctive relief  c. [x] punitive
4. Number of causes of action (specify): 12 (Strict Liability, Negligence, Fraudulent Concealment, Wrongful death, Survival, etc.)
5. This case [ ] is  [x] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: December 16, 2021

Quincy E. Booth
_____
(TYPE OR PRINT NAME)                          ►  _____
                                                (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. September 1, 2021]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
  Auto (22)–Personal Injury/Property
    Damage/Wrongful Death
  Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
  Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
      Wrongful Death
  Product Liability *(not asbestos or toxic/environmental)* (24)
  Medical Malpractice (45)
    Medical Malpractice–
      Physicians & Surgeons
    Other Professional Health Care
      Malpractice
  Other PI/PD/WD (23)
    Premises Liability (e.g., slip
      and fall)
    Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
    Intentional Infliction of
      Emotional Distress
    Negligent Infliction of
      Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
  Business Tort/Unfair Business
    Practice (07)
  Civil Rights (e.g., discrimination,
    false arrest) *(not civil harassment)* (08)
  Defamation (e.g., slander, libel)
    (13)
  Fraud (16)
  Intellectual Property (19)
  Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
      *(not medical or legal)*
  Other Non-PI/PD/WD Tort (35)

**Employment**
  Wrongful Termination (36)
  Other Employment (15)

**Contract**
  Breach of Contract/Warranty (06)
    Breach of Rental/Lease
      Contract *(not unlawful detainer or wrongful eviction)*
    Contract/Warranty Breach–Seller
      Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
      Warranty
    Other Breach of Contract/Warranty
  Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections
      Case
  Insurance Coverage *(not provisionally complex)* (18)
    Auto Subrogation
    Other Coverage
  Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
  Eminent Domain/Inverse
    Condemnation (14)
  Wrongful Eviction (33)
  Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
  Commercial (31)
  Residential (32)
  Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
  Asset Forfeiture (05)
  Petition Re: Arbitration Award (11)
  Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
      Case Matter
    Writ–Other Limited Court Case
      Review
  Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
  Antitrust/Trade Regulation (03)
  Construction Defect (10)
  Claims Involving Mass Tort (40)
  Securities Litigation (28)
  Environmental/Toxic Tort (30)
  Insurance Coverage Claims
    *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
  Enforcement of Judgment (20)
    Abstract of Judgment (Out of
      County)
    Confession of Judgment *(non-domestic relations)*
    Sister State Judgment
    Administrative Agency Award
      *(not unpaid taxes)*
    Petition/Certification of Entry of
      Judgment on Unpaid Taxes
    Other Enforcement of Judgment
      Case

**Miscellaneous Civil Complaint**
  RICO (27)
  Other Complaint *(not specified above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-harassment)*
    Mechanics Lien
    Other Commercial Complaint
      Case *(non-tort/non-complex)*
    Other Civil Complaint
      *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
  Partnership and Corporate
    Governance (21)
  Other Petition *(not specified above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
      Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late
      Claim
    Other Civil Petition

**CIVIL CASE COVER SHEET**

For your protection and privacy, please press the Clear

| SHORT TITLE: Tiffany White v. Kids 2, Inc. | CASE NUMBER |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

### Applicable Reasons for Choosing Court Filing Location (Column C)

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.
2. Permissive filing in central district.
3. Location where cause of action arose.
4. Mandatory personal injury filing in North District.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.

7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.
11. Mandatory filing location (Hub Cases — unlawful detainer, limited non-collection, limited collection, or personal injury).

| A Civil Case Cover Sheet Category No. | B Type of Action (Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|
| Auto (22) | ☐ A7100 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| Uninsured Motorist (46) | ☐ A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1, 4, 11 |
| Asbestos (04) | ☐ A6070 Asbestos Property Damage | 1, 11 |
| | ☐ A7221 Asbestos - Personal Injury/Wrongful Death | 1, 11 |
| Product Liability (24) | ☑ A7260 Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| Medical Malpractice (45) | ☐ A7210 Medical Malpractice - Physicians & Surgeons | 1, 4, 11 |
| | ☐ A7240 Other Professional Health Care Malpractice | 1, 4, 11 |
| Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250 Premises Liability (e.g., slip and fall) | 1, 4, 11 |
| | ☐ A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1, 4, 11 |
| | ☐ A7270 Intentional Infliction of Emotional Distress | 1, 4, 11 |
| | ☐ A7220 Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |

*Left margin labels:* Auto Tort | Other Personal Injury/ Property Damage/Wrongful Death Tort

| LASC CIV 109 Rev. 12/18 | **CIVIL CASE COVER SHEET ADDENDUM** | Local Rule 2.3 |
|---|---|---|
| For Mandatory Use | **AND STATEMENT OF LOCATION** | Page 1 of 4 |

| SHORT TITLE: Tiffany White v. Kids 2, Inc. | | CASE NUMBER |
|---|---|---|

| | A Civil Case Cover Sheet Category No. | B Type of Action (Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1, 2, 3 |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ A6109  Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract/ Warranty (06) (not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ A6008  Contract/Warranty Breach –Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1, 2, 5 |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 5, 6, 11 |
| | | ☐ A6012  Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ A6034  Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ A6031  Tortious Interference | 1, 2, 3, 5 |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation         Number of parcels_____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2, 6 |
| | | ☐ A6032  Quiet Title | 2, 6 |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2, 6, 11 |

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 2 of 4

| SHORT TITLE: Tiffany White v. Kids 2, Inc. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C Applicable<br>Reasons – See Step 3<br>Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ A6151  Writ – Administrative Mandamus | 2, 8 |
| | | ☐ A6152  Writ – Mandamus on Limited Court Case Matter | 2 |
| | | ☐ A6153  Writ – Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1, 2, 8 |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment | 2, 5, 11 |
| | | ☐ A6160  Abstract of Judgment | 2, 6 |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2, 8 |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1, 2, 8 |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2, 8 |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment With Damages | 2, 3, 9 |
| | | ☐ A6123  Workplace Harassment With Damages | 2, 3, 9 |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case With Damages | 2, 3, 9 |
| | | ☐ A6190  Election Contest | 2 |
| | | ☐ A6110  Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ A6100  Other Civil Petition | 2, 9 |

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 3 of 4

| SHORT TITLE: Tiffany White v. Kids 2, Inc. | CASE NUMBER |
|---|---|

**Step 4:** **Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

| REASON: | ADDRESS: |
|---|---|
| ☐ 1. ☐ 2. ☐ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☑ 11. | 3150 W Imperial Hwy |

| CITY: | STATE | ZIP CODE: |
|---|---|---|
| Inglewood | CA | 90303 |

**Step 5:** **Certification of Assignment:** I certify that this case is properly filed in the ___Central___ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: December 16, 2016

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).

5. Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 4 of 4

**FILED**
Superior Court of California
County of Los Angeles

**FEB 24 2020**

2020-SJ-002-00

Sheri R Carter, Executive Officer/Clerk
By _____ Deputy

1

2

3    SUPERIOR COURT OF THE STATE OF CALIFORNIA

4    FOR THE COUNTY OF LOS ANGELES

5

6    IN RE PERSONAL INJURY            ) CASE NO.:
     COURT ("PI COURT") PROCEDURES    )
7    SPRING STREET COURTHOUSE         ) FIRST AMENDED STANDING ORDER
     (EFFECTIVE FEBRUARY 24, 2020)    ) RE: PERSONAL INJURY PROCEDURES
8                                     ) AT THE SPRING STREET COURTHOUSE

9

10   ┌─────────────────────────────────────────────────────────┐
11   │  **ALL HEARINGS ARE SET IN THE DEPARTMENT AS**          │
     │  **REFLECTED IN THE NOTICE OF CASE ASSIGNMENT**         │
12   │                                                         │
13   │  **FINAL STATUS CONFERENCE:**                           │
14   │       DATE: _____ AT 10:00 A.M.             │
15   │  **TRIAL:**                                             │
16   │       DATE: _____ AT 8:30 A.M.              │
17   │  **OSC RE DISMISSAL**                                   │
18   │  **(CODE CIV. PROC., § 583.210):**                      │
19   │       DATE: _____ AT 8:30 A.M.              │
20   └─────────────────────────────────────────────────────────┘

21   TO EACH PARTY AND TO THE ATTORNEY OF RECORD FOR EACH PARTY:

22        Pursuant to the California Code of Civil Procedure ("C.C.P."), the California Rules of

23   Court ("C.R.C.") and the Los Angeles County Court Rules ("Local Rules"), the Los Angeles

24   Superior Court ("LASC" or "Court") HEREBY AMENDS AND SUPERSEDES THE

25   SEPTEMBER 26, 2019 STANDING ORDER AND, GENERALLY ORDERS AS FOLLOWS

26   IN THIS AND ALL OTHER GENERAL JURISDICTION PERSONAL INJURY ("PI")

27   ACTIONS FILED IN THE CENTRAL DISTRICT.

28   ///

Page 1 of 7

First Amended Standing Order Re Personal Injury Procedures, Spring Street Courthouse

2020-SJ-002-00

1.       To ensure proper assignment to a PI Court, plaintiff(s) must carefully fill out the Civil Case Cover Sheet Addendum (form LACIV 109).  The Court defines "personal injury" as: "an unlimited civil case described on the Civil Case Cover Sheet Addendum and Statement of Location (LACIV 109) as Motor Vehicle-Personal Injury/Property Damage/Wrongful Death; Personal Injury/Property Damage/Wrongful Death-Uninsured Motorist; Product Liability (other than asbestos or toxic/environmental); Medical Malpractice-Physicians & Surgeons; Other Professional Health Care Malpractice; Premises Liability; Intentional Bodily Injury/Property Damage/Wrongful Death; or Other Personal Injury/Property Damage/Wrongful Death. An action for intentional infliction of emotional distress, defamation, civil rights/discrimination, or malpractice (other than medical malpractice), is not included in this definition. An action for injury to real property is not included in this definition" (Local Rule 2.3(a)(1) (A)).

Consistent with Local Rule 2.3(a)(1)(A), the Court will assign a case to the PI Courts if plaintiff(s) checks any of the following boxes in the Civil Case Cover Sheet Addendum:

☐ A7100 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death

☐ A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist

☐ A7260 Product Liability (not asbestos or toxic/environmental)

☐ A7210 Medical Malpractice – Physicians & Surgeons

☐ A7240 Medical Malpractice – Other Professional Health Care Malpractice

☐ A7250 Premises Liability (e.g., slip and fall)

☐ A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism etc.)

☐ A7220 Other Personal Injury/Property Damage/Wrongful Death

The Court will not assign cases to the PI Courts if plaintiff(s) checks any boxes elsewhere in the Civil Case Cover Sheet Addendum (any boxes on pages two and three of that form).

The Court sets the above dates in this action in the PI Court as reflected in the Notice of Case Assignment at the Spring Street Courthouse, 312 North Spring Street, Los Angeles, CA

First Amended Standing Order Re Personal Injury Procedures, Spring Street Courthouse

2020-SJ-002-00

1   90012 (C.R.C. Rules 3.714(b)(3), 3.729).

2   **FILING OF DOCUMENTS**

3   2.      With the exception of self-represented litigants or parties or attorneys that have obtained

4   an exemption from mandatory electronic filing, parties must electronically file documents.

5   Filings are no longer accepted via facsimile. The requirements for electronic filing are detailed

6   in the Court's operative General Order Re Mandatory Electronic Filing for Civil, available online

7   at www.lacourt.org (link on homepage).

8   **SERVICE OF SUMMONS AND COMPLAINT**

9   3.      Plaintiff(s) shall serve the summons and complaint in this action upon defendant(s) as

10  soon as possible but no later than three years from the date when the complaint is filed

11  (C.C.P. § 583.210, subd. (a)). On the OSC re Dismissal date noted above, the PI Court will

12  dismiss the action and/or all unserved parties unless the plaintiff(s) shows cause why the action

13  or the unserved parties should not be dismissed (C.C.P. §§ 583.250; 581, subd. (b)(4)).

14  4.      The Court sets the above trial and final status conference ("FSC") dates on the condition

15  that plaintiff(s) effectuate service on defendant(s) of the summons and complaint within six

16  months of filing the complaint.

17  5.      The PI Court will dismiss the case without prejudice pursuant to Code of Civil Procedure

18  § 581 when no party appears for trial.

19  **STIPULATIONS TO CONTINUE TRIAL**

20  6.      Provided that all parties agree (and there is no violation of the "five-year rule" (C.C.P.

21  § 583.310)), the parties may advance or continue any trial date in the PI Courts without showing

22  good cause or articulating any reason or justification for the change. To continue or advance a

23  trial date, the parties (or their counsel of record) should jointly execute and submit a Stipulation

24  to Continue Trial, FSC and Related Motion/Discovery Dates (form LACIV CTRL-242, available

25  on the court's website, Personal Injury Court link). The PI Courts schedule FSCs at 10:00 a.m.,

26  eight court days before the trial date. Parties seeking to continue the trial and FSC dates shall

27  file the stipulation at least eight court days before the FSC date. Parties seeking to advance the

28  trial and FSC dates shall file the stipulation at least eight court days before the proposed advanced

Page 3 of 7

First Amended Standing Order Re Personal Injury Procedures, Spring Street Courthouse

2020-SJ-002-00

1  FSC date (C.C.P. § 595.2;  Govt. Code § 70617, subd. (c)(2)).  In selecting a new trial date,
2  parties should avoid setting on any Monday, or the Tuesday following a court holiday.  Parties
3  may submit a maximum of two stipulations to continue trial, for a total continuance of six
4  months.  Subsequent requests to continue trial will be granted upon a showing of good cause by
5  noticed motion.  This rule is retroactive so that any previously granted stipulation to continue
6  trial will count toward the maximum number of allowed continuances.

7  **NO CASE MANAGEMENT CONFERENCES**

8  7.      The PI Courts do not conduct case management conferences.  The parties need not file a
9  Case Management Statement.

10  **LAW AND MOTION**

11  8.      Any and all electronically-filed documents must be text searchable and bookmarked.
12  (*See* operative General Order re Mandatory Electronic Filing in Civil).

13  **COURTESY COPIES REQUIRED**

14  9.      Pursuant to the operative General Order re Mandatory Electronic Filing, courtesy
15  copies of certain documents must be submitted directly to the PI Court courtrooms at the
16  Spring Street Courthouse.  The PI Courts also strongly encourage the parties filing and
17  opposing lengthy motions, such as motions for summary judgment/adjudication, to submit one
18  or more three-ring binders organizing the courtesy copy behind tabs.  Any courtesy copies of
19  documents with declarations and/or exhibits must be tabbed (C.R.C. Rule 3.1110(f)).  All
20  deposition excerpts referenced in briefs must be marked on the transcripts attached as exhibits
21  (C.R.C. Rule 3.1116(c)).

22  **RESERVATION HEARING DATE**

23  10.    Parties must reserve hearing dates for motions in the PI Courts using the Court
24  Reservation System (CRS) available online at *www.lacourt.org* (link on homepage).  After
25  reserving a motion hearing date, the reservation requestor must submit the papers for filing with
26  the reservation receipt number printed on the face page of the document under the caption and
27  attach the reservation receipt as the last page.  Parties or counsel who are unable to utilize the
28  online CRS may reserve a motion hearing date by calling the PI courtroom, Monday through

First Amended Standing Order Re Personal Injury Procedures, Spring Street Courthouse

2020-SJ-002-06

1   Friday, between 3:00 p.m. and 4:00 p.m.

2   **WITHDRAWAL OF MOTIONS**

3   11.     California Rules of Court, Rule 3.1304(b) requires a moving party to notify the court

4   immediately if a matter will not be heard on the scheduled date.  In keeping with that rule, the

5   PI Courts require parties to comply with Code of Civil Procedure section 472(a) with regard to

6   the amending of pleadings related to demurrers or motions to strike so that the PI Courts do not

7   needlessly prepare tentative rulings for these matters.

8   **DISCOVERY MOTIONS**

9   12.     The purpose of an Informal Discovery Conference ("IDC") is to assist the parties to

10  resolve and/or narrow the scope of discovery disputes.  Lead trial counsel on each side, or another

11  attorney with full authority to make binding agreements, must attend in person.  The PI judges

12  have found that, in nearly every case, the parties amicably resolve disputes with the assistance

13  of the Court.

14  13.     Parties <u>must</u> participate in an IDC <u>before</u> a Motion to Compel Further Responses to

15  Discovery will be heard unless the moving party submits evidence, by way of declaration, that

16  the opposing party has failed or refused to participate in an IDC.  Scheduling or participating in

17  an IDC does not automatically extend any deadlines imposed by the Code of Civil Procedure for

18  noticing and filing discovery motions.  Ideally, the parties should participate in an IDC before a

19  motion is filed because the IDC may avoid the necessity of a motion or reduce its scope.  Because

20  of that possibility, attorneys are encouraged to stipulate to extend the 45 (or 60) day deadline for

21  filing a motion to compel further discovery responses in order to allow time to participate in an

22  IDC.

23          If parties do not stipulate to extend the deadlines, the moving party may file the motion

24  to avoid it being deemed untimely.   However, the IDC must take place before the motion is

25  heard so it is suggested that the moving party reserve a date for the motion hearing that is at least

26  60 days after the date when the IDC reservation is made.  Motions to Compel Further Discovery

27  Responses are heard at 10:00 a.m.  If the IDC is not productive, the moving party may advance

28  the hearing on a Motion to Compel Further Discovery Responses on any available hearing date

First Amended Standing Order Re Personal Injury Procedures, Spring Street Courthouse

2020-SJ-002-00

1   that complies with the notice requirements of the Code of Civil Procedure.

2   14.     Parties must reserve IDC dates in the PI Courts using CRS, which is available online at

3   www.lacourt.org (link on homepage). Parties must meet and confer regarding the available dates

4   in CRS prior to accessing the system. After reserving the IDC date, the reservation requestor

5   must file and serve an Informal Discovery Conference Form for Personal Injury Courts (form

6   LACIV 239) at least 15 court days prior to the conference and attach the CRS reservation receipt

7   as the last page. The opposing party may file and serve a responsive IDC form, briefly setting

8   forth that party's response, at least ten court days prior to the IDC.

9   15.     Time permitting, the PI Hub judges may be available to participate in IDCs to try to

10  resolve other types of discovery disputes.

11  **EX PARTE APPLICATIONS**

12  16.     Under the California Rules of Court, courts may only grant *ex parte* relief upon a

13  showing, by admissible evidence, that the moving party will suffer "irreparable harm,"

14  "immediate danger," or where the moving party identifies "a statutory basis for granting relief

15  ex parte" (C.R.C. Rule 3.1202(c)). The PI Courts have no capacity to hear multiple *ex parte*

16  applications or to shorten time to add hearings to their fully booked motion calendars. The PI

17  Courts do not regard the Court's unavailability for timely motion hearings as an "immediate

18  danger" or threat of "irreparable harm" justifying *ex parte* relief. Instead of seeking *ex parte*

19  relief, the moving party should reserve the earliest available motion hearing date (even if it is

20  after the scheduled trial date) and file a motion to continue trial. Parties should also check

21  CRS from time to time because earlier hearing dates may become available as cases settle or

22  hearings are taken off calendar.

23  **REQUEST FOR TRANSFER TO INDEPENDENT CALENDAR DEPARTMENT**

24  17.     Parties seeking to transfer a case from a PI Court to an Independent Calendar ("IC")

25  Court shall file and serve the Court's "Motion/Opposition/Stipulation to Transfer Complicated

26  Personal Injury Case to Independent Calendar Court" (form LACIV 238, available on the Court's

27  website under the PI Courts link). The PI Courts will transfer a matter to an IC Court if the case

28  is not a "Personal Injury" case as defined in this Order, or if it is "complicated." In determining

2020-SJ-002-00

1  whether a personal injury case is "complicated" the PI Courts will consider, among other things,
2  the number of pretrial hearings or the complexity of issues presented.
3  18.      Parties opposing a motion to transfer have five court days to file an Opposition (using
4  the same LACIV 238 Motion to Transfer form).
5  19.      The PI Courts will not conduct a hearing on any Motion to Transfer to IC Court. Although
6  the parties may stipulate to transfer a case to an Independent Calendar Department, the PI Courts
7  will make an independent determination whether to transfer the case or not.
8  **FINAL STATUS CONFERENCE**
9  20.      Parties shall comply with the requirements of the PI Courts' operative Standing Order
10  Re Final Status Conference, which shall be served with the summons and complaint.
11  **JURY FEES**
12  21.      Parties must pay jury fees no later than 365 calendar days after the filing of the initial
13  complaint (C. C. P. § 631, subd. (c)(2)).
14  **JURY TRIALS**
15  22.      The PI Courts do not conduct jury trials.  On the trial date, a PI Court will contact the
16  Master Calendar Court, Department One, in the Stanley Mosk Courthouse.  Department One
17  will assign cases for trial to dedicated Civil Trial Courtrooms and designated Criminal
18  Courtrooms.
19  **SANCTIONS**
20  23.      The Court has discretion to impose sanctions for any violation of this general order
21  (C.C.P. §§ 128.7, 187 and Gov. Code, § 68608, subd. (b)).
22
23
24  Dated:  Feb. 24, 2020                    SAMANTHA P. JESSNER
25                                            Supervising Judge of Civil Courts
26
27
28

Page 7 of 7

First Amended Standing Order Re Personal Injury Procedures, Spring Street Courthouse

2020-BJ-004-00

**FILED**
Superior Court of California
County of Los Angeles

**FEB 24 2020**

Sherri R. Carter, Executive Officer/Clerk

By_____ Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES – CENTRAL DISTRICT

| | |
|---|---|
| IN RE PERSONAL INJURY CASES ASSIGNED TO THE PERSONAL INJURY COURTS AT THE SPRING STREET COURTHOUSE | THIRD AMENDED STANDING ORDER RE: FINAL STATUS CONFERENCE, PERSONAL INJURY ("PI") COURTS (Effective January 13, 2020) |

The dates for Trial and the Final Status Conference ("FSC") having been set in this matter, the COURT HEREBY AMENDS AND SUPERSEDES ITS August 9, 2019 STANDING ORDER RE: FINAL STATUS CONFERENCE, PERSONAL INJURY ("PI") COURTS AND, GENERALLY ORDERS AS FOLLOWS IN THIS AND ALL OTHER GENERAL JURISDICTION PERSONAL INJURY ACTIONS:

1. **PURPOSE OF THE FSC**

The purpose of the FSC is to verify that the parties/counsel are completely ready to proceed with trial continuously and efficiently, from day to day, until verdict. The PI Courts will verify at the FSC that all parties/counsel have (1) prepared the Exhibit binders and Trial Document binders and (2) met and conferred in an effort to stipulate to ultimate facts, legal issues, motions in limine, and the authentication and admissibility of exhibits.

///

///

///

Page 1 of 5

## 2.   TRIAL DOCUMENTS TO BE FILED

At least five calendar days prior to the Final Status Conference, the parties/counsel shall serve and file the following Trial Readiness Documents:

### A.   TRIAL BRIEFS (OPTIONAL)

Each party/counsel may, but is not required to, file a trial brief succinctly identifying:

(1) the claims and defenses subject to litigation;

(2) the major legal issues (with supporting points and authorities);

(3) the relief claimed and calculation of damages sought; and

(4) any other information that may assist the court at trial.

### B.   MOTIONS IN LIMINE

Before filing motions in limine, the parties/counsel shall comply with the statutory notice provisions of Code of Civil Procedure ("C.C.P.") Section 1005 and the requirements of Los Angeles County Court Rule ("Local Rule") 3.57(a). The caption of each motion in limine shall concisely identify the evidence that the moving party seeks to preclude. Parties filing more than one motion in limine shall number them consecutively. Parties filing opposition and reply papers shall identify the corresponding motion number in the caption of their papers.

### C.   JOINT STATEMENT TO BE READ TO THE JURY

For jury trials, the parties/counsel shall work together to prepare and file a joint written statement of the case for the court to read to the jury (Local Rule 3.25(g)(4)).

### D.   JOINT WITNESS LIST

The parties/counsel shall work together to prepare and file a joint list of all witnesses that each party intends to call, excluding impeachment and rebuttal witnesses (Local Rule 3.25(g)(5)). The joint witness list shall identify each witness by name, specify which witnesses are experts, estimate the length of the direct, cross examination and re-direct examination (if any) of each, and include a total of the number of hours for all witness testimony. The parties/counsel shall identify all potential witness scheduling issues and special requirements. Any party/counsel who seeks to elicit testimony from a witness not identified on the witness list must first make a showing of good cause to the trial court.

Page 2 of 5

**E.   LIST OF PROPOSED JURY INSTRUCTIONS**
**(JOINT AND CONTESTED)**

The parties/counsel shall jointly prepare and file a list of proposed jury instructions, organized in numerical order, specifying the instructions upon which all sides agree and the contested instructions, if any. The List of Proposed Jury Instructions must include a space by each instruction for the judge to indicate whether the instruction was given.

**F.   JURY INSTRUCTIONS**
**(JOINT AND CONTESTED)**

The parties/counsel shall prepare a complete set of full-text proposed jury instructions, editing all proposed California Civil Jury Instructions and insert party name(s) and eliminate blanks, brackets, and irrelevant material. The parties/counsel shall prepare special instructions in a format ready for submission to the jury with the instruction number, title, and text only (i.e., there should be no boxes or other indication on the printed instruction itself as to the requesting party).

**G.   JOINT VERDICT FORM(S)**

The parties/counsel shall prepare and jointly file a proposed general verdict form or special verdict form (with interrogatories) acceptable to all sides (Local Rule 3.25(g)(8)). If the parties/counsel cannot agree on a joint verdict form, each party must separately file a proposed verdict form.

**H.   JOINT EXHIBIT LIST**

The parties/counsel shall prepare and file a joint exhibit list organized with columns identifying each exhibit and specifying each party's evidentiary objections, if any, to admission of each exhibit. The parties/counsel shall meet and confer in an effort to resolve objections to the admissibility of each exhibit.

**I.   PAGE AND LINE DESIGNATION FOR**
**DEPOSITION AND FORMER TESTIMONY**

If the parties/counsel intend to use deposition testimony or former trial testimony in lieu of any witness's live testimony, the parties/counsel shall meet and confer and jointly prepare and file a chart with columns for each of the following:  1) the page and line designations of the deposition or

former testimony requested for use, 2) objections, 3) counter-designations, 4) any responses thereto, and 5) the Court's ruling.

**3.    EVIDENTIARY EXHIBITS**

The parties/counsel shall jointly prepare (and be ready to temporarily lodge for inspection at the FSC) three sets of tabbed, internally paginated by document, and properly-marked exhibits, organized numerically in three-ring binders (a set for the Court, the Judicial Assistant and the witnesses).  The parties/counsel shall mark all non-documentary exhibits and insert a simple written description of the exhibit behind the corresponding numerical tab in the exhibit binder.  If the parties have a joint signed exhibit list and electronic copies of their respective exhibits, then the parties/counsel will not be required to produce exhibit binders at the FSC.  However, the exhibit binders will be required by the assigned trial judge when the trial commences.  In the absence of either a joint signed exhibit list or electronic copies, exhibit binders will be required to be produced by all parties/counsel at the FSC.

**4.    TRIAL BINDERS REQUIRED IN THE PI COURTS**

The parties/counsel shall jointly prepare (and be ready to temporarily lodge and include the following for inspection at the FSC) the Trial Documents consisting of conformed copies (if available), tabbed and organized into three-ring binders with a table of contents that includes the following:

| | |
|---|---|
| **Tab A:** | Trial Briefs (Optional) |
| **Tab B:** | Motions in Limine |
| **Tab C:** | Joint Statement to Be Read to the Jury |
| **Tab D:** | Joint Witness List |
| **Tab E:** | Joint List of Jury Instructions (identifying the agreed upon and contested Instructions) |
| **Tab F:** | Joint and Contested Jury Instructions |
| **Tab G:** | Joint and/or Contested Verdict Form(s) |
| **Tab H:** | Joint Exhibit List |

Tab I:      Joint Chart of Page and Line Designation(s) for Deposition and
            Former Testimony

Tab J:      Copies of the Current Operative Pleadings (including the operative complaint,
            answer, cross-complaint, if any, and answer to any cross-complaint).

        The parties/counsel shall organize motions in limine (tabbed in numerical order) behind Tab
B with the opposition papers and reply papers for each motion placed directly behind the moving
papers.  The parties shall organize proposed jury instructions behind Tab F, with the agreed upon
instructions first in order followed by the contested instructions (including special instructions)
submitted by each side.

5.      **FAILURE TO COMPLY WITH FSC OBLIGATIONS**

        The court has discretion to require any party/counsel who fails or refuses to comply with this
Amended Standing Order to Show Cause why the Court should not impose monetary, evidentiary
and/or issue sanctions (including the entry of a default or the striking of an answer).

Dated: _Feb. 24, 2020_

                                    SAMANTHA P. JESSNER
                                    Supervising Judge of Civil Courts

**FILED**
Superior Court of California
County of Los Angeles

**OCT 08 2021**

Sherri R. Carter, Executive Officer/Clerk

By_____, Deputy
Corina Alarno

2021-SJ-018-00

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES – CENTRAL DISTRICT

| | |
|---|---|
| In re Personal Injury Cases Assigned to the Personal Injury Courts at the Spring Street Courthouse | ) SECOND AMENDED SUPPLEMENTAL<br>) STANDING ORDER RE COVID<br>) PROTECTIVE MEASURES RELATED TO<br>) FINAL STATUS CONFERENCES IN<br>) PERSONAL INJURY CASES AT THE<br>) SPRING STREET COURTHOUSE<br>) |

     In an effort to reduce the number of in-person appearances in the Personal Injury ("PI") courtrooms located in the Spring Street courthouse and to prevent the transmission of the COVID-19 virus, the court hereby issues this supplemental order to the Third Amended Standing Order re: Final Status Conference Personal Injury Courts dated February 24, 2020 ("Operative PI FSC Order").

    **1.    ELECTRONIC TRIAL BINDERS**

    As set forth in the Operative PI FSC Order, parties/counsel must file and serve Trial Readiness Documents at least five calendar days prior to the FSC. Instead of providing the court that will be conducting the FSC with the trial binders as described in the Operative PI FSC Order and appearing in person, parties/counsel are ordered to provide the trial binders in electronic form. This will allow parties and attorneys to appear remotely for the final status conference and provide the court with the opportunity to review the trial binders to determine whether the parties/counsel are ready for trial. Hard copies of the binders prepared in accordance with the Operative PI FSC Order will continue to be required for the trial courtroom.

///

2.  **REQUIREMENTS OF ELECTRONIC TRIAL BINDERS**

At least <u>two</u> court days before the FSC, parties/counsel must submit via email a joint electronic trial binder to the courtroom conducting the FSC as follows:

a.  The parties/counsel must submit in <u>one</u> PDF the joint statement of the case, joint witness list, joint list of jury instructions, full-text joint and contested jury instructions, joint and/or contested verdict form(s), joint exhibit list, and joint deposition designation chart as listed in paragraph 4 of the Operative PI FSC Order.

b.  The trial briefs and motions in limine, oppositions, and replies, if any, must be submitted in a separate PDF.

c.  The PDFs must be text searchable.

d.  The PDFs must be bookmarked which is essentially an electronic tab so that the FSC judge can easily find and navigate among the trial documents. (See https://helpx.adobe.com/acrobat/using/page-thumbnails-bookmarks-pdfs.html and/or https://support.microsoft.com/en-us/office/ for bookmarking instructions).

e.  The PDFs must be emailed to the applicable email address listed below:

Department 27 at sscdept27FSC@LACourt.org

Department 28 at sscdept28FSC@LACourt.org

Department 29 at sscdept29FSC@LACourt.org

Department 30 at sscdept30FSC@LACourt.org

Department 31 at sscdept31FSC@LACourt.org

Department 32 at sscdept32FSC@LACourt.org

f.  The subject line in the email must include identifying case information as follows:

[Insert Case Number] Trial Readiness Binder, FSC, [Insert MM/DD/YEAR of Hearing Date] (e.g. 19STCV00001 Trial Readiness Binder, FSC 01/11/2021).

SECOND AMENDED SUPPLEMENTAL STANDING ORDER RE COVID PROTECTIVE MEASURES RELATED TO FINAL STATUS CONFERENCES IN PERSONAL INJURY CASES AT THE SPRING STREET COURTHOUSE

g. Each email should have two PDFs attached – one containing the Trial Readiness documents and the other containing the trial briefs and motions in limine, if applicable.

h. The parties need not submit the evidentiary exhibit binders at the FSC. However, the parties shall prepare the exhibit binders as required in paragraph 5 of the Operative PI FSC Order and be prepared to represent to the court that they have been properly prepared. Hard copies of the exhibit binders will be required for trial.

**3. FAILURE TO COMPLY WITH FSC OBLIGATIONS**

The court has discretion to require any party/counsel who fails or refuses to comply with this Supplemental Standing Order to show cause why the Court should not impose monetary, evidentiary and/or issue sanctions (including the entry of a default or the striking of an answer). In addition, failure to timely and fully comply with this order may result in the case not being assigned a trial courtroom by Dept. 1.

Dated: 10/8/2021

David J. Cowan
Supervising Judge, Civil
Los Angeles Superior Court

Page 3 of 3

SECOND AMENDED SUPPLEMENTAL STANDING ORDER RE COVID PROTECTIVE MEASURES RELATED TO FINAL STATUS CONFERENCES IN PERSONAL INJURY CASES AT THE SPRING STREET COURTHOUSE

FILED   2021-SJ-008-00
Superior Court of California
County of Los Angeles

JUN 23 2021

Sherri R. Carter, Executive Officer/Clerk
By _____, Deputy
Edward Albino

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| IN RE PERSONAL INJURY CASES ASSIGNED TO PERSONAL INJURY COURTROOMS AT THE SPRING STREET COURTHOUSE ) ) ) ) ) ) ) ) ) ) | SIXTH AMENDED STANDING ORDER RE: MANDATORY SETTLEMENT CONFERENCE (Effective June 21, 2021) |

TO EACH PARTY AND TO THE ATTORNEY OF RECORD FOR EACH PARTY:

Pursuant to California Code of Civil Procedure, the California Rules of Court and the Los Angeles Court Rules, the Los Angeles Superior Court (Court) HEREBY AMENDS AND SUPERSEDES THE FEBRUARY 24, 2020 FIFTH AMENDED STANDING ORDER, AND THE COURT HEREBY ISSUES THE FOLLOWING SIXTH AMENDED STANDING ORDER:

The Court orders the parties to participate in a virtual Mandatory Settlement Conference (MSC) supervised by a judge and staffed by volunteer attorneys who have significant experience in handling these types of cases and are members of the American Board of Trial Advocates, the Association of Southern California Defense Counsel, the Consumer Attorneys Association of Los Angeles, and or the Beverly Hills Bar Association, and have continuing professional interest as officers of the court in its successful operation.

1. Plaintiff's counsel shall within two (2) court days of the Court's Order of an MSC access the ResolveLawLA website at www.resolvelawla.com to create an account and register the case for MSC. Plaintiff's counsel must coordinate with defense counsel and select a mutually agreed upon date and time for the MSC prior to the trial date. Plaintiff's counsel shall also provide the name, email address, and phone number for defense counsel when registering the case for an MSC.

2021-SJ-008-00

2. A mandatory settlement conference statement shall be lodged by each party with the ResolveLawLA website and served on all parties not less than five (5) court days before the scheduled MSC. The settlement conference statement shall be limited to five (5) pages on the MSC Brief and ten (10) pages for exhibits. ResolveLawLA MSCs are available at 9 a.m. and 1:30 p.m. Monday through Friday, excluding court holidays, and are conducted via Zoom.

3. Pursuant to California Rules of Court, Rule 3.1380(b) and Los Angeles Superior Court Rule 3.25(d), trial counsel, the parties and persons with full authority to settle the case (including insurance company representatives) must attend virtually via the website unless a judge has excused the virtual appearance for good cause. Once defense counsel is notified that the matter has been scheduled for a remote MSC, defense counsel shall create their own login to the resolvelawla.com system, and shall list all parties, party representatives and insurance adjusters' names, phone numbers, and emails where indicated. In the event the MSC needs to be canceled, it must be canceled through the ResolveLawLA system.

4. If the case settles prior to the scheduled MSC, Plaintiff's counsel shall forthwith notify the courtroom to which the case is assigned of such settlement. The parties should also document their settlement agreement in a writing signed by all parties. Upon receiving notification, the ResolveLawLA system will send notifications via text and/or email and will include a Zoom link for counsel, the parties, and insurance representatives to join the remote MSC.

5. The Court has the discretion to require any party and/or counsel who fails or refuses to comply with this order, to show cause why the Court should not impose monetary sanctions.

IT IS SO ORDERED.

Dated: ___6/28/21___   _____David Cowan_____

Judge David J. Cowan
Supervising Judge, Civil Division

2

STANDING ORDER -- Sixth Amended Standing Order
re MSC In Re PI Cases Assigned to PI Courtrooms at Spring Street Courthouse

## VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California
County of Los Angeles**



**Los Angeles County
Bar Association
Litigation Section**

**Los Angeles County
Bar Association Labor and
Employment Law Section**



**Consumer Attorneys
Association of Los Angeles**



**Southern California
Defense Counsel**

**Association of
Business Trial Lawyers**



**California Employment
Lawyers Association**

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

◆**Los Angeles County Bar Association Litigation Section**◆

◆ **Los Angeles County Bar Association
Labor and Employment Law Section**◆

◆**Consumer Attorneys Association of Los Angeles**◆

◆**Southern California Defense Counsel**◆

◆**Association of Business Trial Lawyers**◆

◆**California Employment Lawyers Association**◆

LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | FAX NO. (Optional) | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – EARLY ORGANIZATIONAL MEETING | CASE NUMBER: |
|---|---|

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following:*

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| SHORT TITLE | | CASE NUMBER |
|---|---|---|
| | | |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h. Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

i. Whether the case is suitable for the Expedited Jury Trial procedures (see information at *www.lacourt.org* under "*Civil*" and then under "*General Information*").

2. The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the complaint, and _____ for the cross-
           (INSERT DATE)                              (INSERT DATE)
complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at *www.lacourt.org* under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".

3. The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

Date:

_____
(TYPE OR PRINT NAME)

_____
(ATTORNEY FOR PLAINTIFF)

_____
(ATTORNEY FOR DEFENDANT)

_____
(ATTORNEY FOR DEFENDANT)

_____
(ATTORNEY FOR DEFENDANT)

_____
(ATTORNEY FOR _____)

_____
(ATTORNEY FOR _____)

_____
(ATTORNEY FOR _____)

| MAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:     FAX NO. (Optional): | | |
| E-MAIL ADDRESS (Optional): | | |
| ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION – DISCOVERY RESOLUTION** | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

    a. The party requesting the Informal Discovery Conference will:

        i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

        ii. Include a brief summary of the dispute and specify the relief requested; and

        iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

    b. Any Answer to a Request for Informal Discovery Conference must:

        i. Also be filed on the approved form (copy attached);

        ii. Include a brief summary of why the requested relief should be denied;

---

LACIV 036 (new)
LASC Approved 04/11          **STIPULATION – DISCOVERY RESOLUTION**          Page 1 of 3
For Optional Use

| SHORT TITLE: | CASE NUMBER |
|---|---|
|  |  |

    iii.    Be filed within two (2) court days of receipt of the Request; and

    iv.    Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

  c.  No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

  d.  If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied. If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

  e.  If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.  If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.  The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.  Nothing herein will preclude any party from applying ex parte for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.  Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8.  References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

| SHORT TITLE | CASE NUMBER |
|---|---|
|  |  |

**The following parties stipulate:**

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR PLAINTIFF)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR _____)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR _____)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR _____)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk of File Stamp |
|---|---|---|

TELEPHONE NO.:                    FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| INFORMAL DISCOVERY CONFERENCE | CASE NUMBER: |
|---|---|
| (pursuant to the Discovery Resolution Stipulation of the parties) | |

1. **This document relates to:**

   ☐  Request for Informal Discovery Conference
   ☐  Answer to Request for Informal Discovery Conference

2. **Deadline for Court to decide on Request:** _____ (Insert date 10 calendar days following filing of the Request).

3. **Deadline for Court to hold Informal Discovery Conference:** _____ (Insert date 20 calendar days following filing of the Request).

4. **For a Request for Informal Discovery Conference, briefly describe the nature of the discovery dispute, including the facts and legal arguments at issue. For an Answer to Request for Informal Discovery Conference, briefly describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.**

**INFORMAL DISCOVERY CONFERENCE**
(pursuant to the Discovery Resolution Stipulation of the parties)

<table>
<tr><td>NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY</td><td>STATE BAR NUMBER</td><td>Reserved for Clerk's File Stamp</td></tr>
<tr><td>TELEPHONE NO.:<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name):</td><td>FAX NO. (Optional):</td><td></td></tr>
</table>

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION AND ORDER -- MOTIONS IN LIMINE** | CASE NUMBER: |

This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.

**The parties agree that:**

1. At least _____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

    a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

    b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE | CASE NUMBER |
|---|---|
| | |

## The following parties stipulate:

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

Date: _____

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR PLAINTIFF)

➤ _____
(ATTORNEY FOR DEFENDANT)

➤ _____
(ATTORNEY FOR DEFENDANT)

➤ _____
(ATTORNEY FOR DEFENDANT)

➤ _____
(ATTORNEY FOR _____)

➤ _____
(ATTORNEY FOR _____)

➤ _____
(ATTORNEY FOR _____)

## THE COURT SO ORDERS.

Date: _____

_____
JUDICIAL OFFICER

**FILED**

LOS ANGELES SUPERIOR COURT

MAY 11 2011

JOHN A. CLARKE, CLERK

BY NANCY NAVARRO, DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| General Order Re<br>Use of Voluntary Efficient Litigation<br>Stipulations | ORDER PURSUANT TO CCP 1054(a),<br>EXTENDING TIME TO RESPOND BY<br>30 DAYS WHEN PARTIES AGREE<br>TO EARLY ORGANIZATIONAL<br>MEETING STIPULATION |

        Whereas the Los Angeles Superior Court and the Executive Committee of the

Litigation Section of the Los Angeles County Bar Association have cooperated in

drafting "Voluntary Efficient Litigation Stipulations" and in proposing the stipulations for

use in general jurisdiction civil litigation in Los Angeles County;

        Whereas the Los Angeles County Bar Association Litigation Section; the Los

Angeles County Bar Association Labor and Employment Law Section; the Consumer

Attorneys Association of Los Angeles; the Association of Southern California Defense

Counsel; the Association of Business Trial Lawyers of Los Angeles; and the California

Employment Lawyers Association all "endorse the goal of promoting efficiency in

litigation, and ask that counsel consider using these stipulations as a voluntary way to

promote communications and procedures among counsel and with the court to fairly

resolve issues in their cases;"

-1-

ORDER PURSUANT TO CCP 1054(a)

1    Whereas the Early Organizational Meeting Stipulation is intended to encourage
2  cooperation among the parties at an early stage in litigation in order to achieve
3  litigation efficiencies;
4    Whereas it is intended that use of the Early Organizational Meeting Stipulation
5  will promote economic case resolution and judicial efficiency;
6
7    Whereas, in order to promote a meaningful discussion of pleading issues at the
8  Early Organizational Meeting and potentially to reduce the need for motions to
9  challenge the pleadings, it is necessary to allow additional time to conduct the Early
10  Organizational Meeting before the time to respond to a complaint or cross complaint
11  has expired;
12
13    Whereas Code of Civil Procedure section 1054(a) allows a judge of the court in
14  which an action is pending to extend for not more than 30 days the time to respond to
15  a pleading "upon good cause shown";
16
17    Now, therefore, this Court hereby finds that there is good cause to extend for 30
18  days the time to respond to a complaint or to a cross complaint in any action in which
19  the parties have entered into the Early Organizational Meeting Stipulation.  This finding
20  of good cause is based on the anticipated judicial efficiency and benefits of economic
21  case resolution that the Early Organizational Meeting Stipulation is intended to
22  promote.
23
24    IT IS HEREBY ORDERED that, in any case in which the parties have entered
25  into an Early Organizational Meeting Stipulation, the time for a defending party to
26  respond to a complaint or cross complaint shall be extended by the 30 days permitted
27
28
                                    -2-

                        ORDER PURSUANT TO CCP 1054(a)

1   by Code of Civil Procedure section 1054(a) without further need of a specific court

2   order.

3

4   DATED: _May 11, 2011_

5                                            Carolyn B. Kuhl, Supervising Judge of the
                                             Civil Departments, Los Angeles Superior Court
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-

ORDER PURSUANT TO CCP 1054(a)

 **Superior Court of California, County of Los Angeles**

## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS must serve this ADR Information Package on any new parties named to the action with the cross-complaint.**

### What is ADR?
ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration, and settlement conferences. When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR). These alternatives to litigation and trial are described below.

### Advantages of ADR
- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control (with the parties):** Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

### Disadvantages of ADR
- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

### Main Types of ADR
1. **Negotiation:** Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation:** In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all. Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

   Mediation may be appropriate when the parties
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.

   Mediation may **not** be appropriate when the parties
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.